KELLY (LIPPINCOTT v.). See Case No. 8,-381.

KELLY (MILLER v.). See Case No. 9,577.

## Case No. 7,673.

### KELLY et al. v. PHELAN.

[5 Dill. 228.][1]

Circuit Court, E. D. Missouri. 1879.

BANKER'S LIEN AS AGAINST ASSIGNEE IN BANKRUPTCY.

1. A banker has a lien on all securities of his debtor in his hands for the general balance of his account. unless such a lien is inconsistent with the actual or presumed intention of the parties.

2. Upon the circumstances of the particular transaction, a banker's lien was established as against an assignee in bankruptcy.

[In review of the action of the district court of the United States for the Eastern district of Missouri.]

This is a contest between Kelly & Co. and M. H. Phelan, assignee in bankruptcy of the Central Savings Bank, and the substantial question is whether Kelly & Co. are entitled to a banker's lien on certain bonds and stocks owned by the bankrupt and held by Kelly & Co. at the date of the filing of the petition in bankruptcy. The district court decided in favor of Kelly & Co., and the assignee brought this bill of review.

William R. Walker and Donovan & Conroy, for assignee. E. T. Farish, for Kelly & Co.

DILLON, Circuit Judge (orally). This is a contest which involves the right of the respective parties to a fund of about $16,000 arising from the sale of certain securities. The bankrupt is the Central Savings Bank, of this city; Mr. Phelan is the assignee. The petitioners for this fund are the firm of Kelly & Co., in New York City, bankers. Kelly & Co. had for years been the correspondents in that city of the Central Savings Bank, of this city, and the transactions between them had been very large. It appears from the proofs here, that at times the bankrupt bank had on deposit to their credit with Kelly & Co. as high as $300,000; the deposits running down at times to a very small amount. On one occasion, in addition to the time immediately preceding the bankruptcy, there was a slight overdraft. In 1873 the bankrupt bank was the owner of bonds of the state of South Carolina, subject to a debt to certain persons in New York City, and

they directed the petitioners, Kelly & Co., to take up these bonds and hold them. The petitioners did that by paying the amount that was owing upon them out of moneys which *stood to the credit of the bankrupt bank—* they redeemed these bonds for the Central Savings Bank out of money which stood to the credit of the Central Savings Bank.

Sometime afterwards, in 1875, the bankrupt being the owner of two thousand shares *of the capital stock of the Kansas Pacific Railway,* and two hundred shares of the common stock of the St. Louis, Kansas City and Northern Railway Company, transmitted the stocks to the petitioners, Kelly & Co., without any specific directions. The letter in which that transmission was made is not in the record, but it is stated in the testimony it was done with a view that the stocks might be more conveniently sold if the Central Savings Bank desired to do so. It is enough to say, on this point, that there was no specific pledge, on the one hand, of these bonds to Kelly & Co., nor any express agreement that they should hold them as security for any overdrafts which might be made upon them. There was no express agreement of this kind; nor, on the other hand, was there any express agreement that they should not thus hold them, or that they were specially pledged for any collateral or definite purpose. They were sent there under those circumstances; so that in 1876, when the bankruptcy of the Central Savings Bank occurred, the condition of affairs between these two parties was, in substance, this: The one was the correspondent of the other. Kelly & Co. had the possession (obtained in the manner which I have briefly stated) of these South Carolina bonds, the Kansas Pacific and the St. Louis, Kansas City and Northern Railway stocks.

On the 5th day of July, 1876, the Central Savings Bank awoke to a very alarming state of affairs. The day preceding had been the 4th of July—a legal holiday. There were two days' drafts to be provided for, and the clearing house showed there was a debit against them of $50,000, and they had not the means wherewith to pay. What took place in this crisis, as bearing on this transaction, is very well stated in Mr. Conroy's brief. Mr. Conroy represents the assignee, and he has stated the case as strongly for the assignee as the facts warrant. though I think he has stated it fairly. He says: "The money was not on hand to meet this $50,000 at the clearing house. The president of the bank was at once consulted, and the following telegram was the result: 'St. Louis, July 5th, 1876. To Eugene Kelly & Co., New York: Can we overdraw to $50,-000? (Signed) Central Savings Bank.' After sending that dispatch, and before receiving Kelly & Co.'s answer, the Central Savings Bank drew drafts on Kelly & Co. for about $30,000, and remitted to them $6,000. Kelly & Co.'s answer to the telegram was as

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

follows: 'New York, July 5th, 1876. To Central Savings Bank, St. Louis: Not to exceed $20,000, present overdrafts included;' which was about $10,000. The officers of the Central Savings Bank took it for granted that Kelly & Co. would comply with their request, and finding that they did not, they sent the dispatch to them next copied on the day the bank failed. The bank, after doing business all day, closed on the night of July 6th, and never reopened. 'St. Louis, July 6th, 1876. To Eugene Kelly & Co., New York: Dispatch received after banking hours; drew $24,000 more currency. Protect drafts. We will remit or forward securities to cover.' (Signed) Central Savings Bank.' The promise was that they would 'remit or forward securities.' What they did in redemption of that promise was this: On the same day, July 6th, the bank officers sent two deeds for property mentioned in the record, conveying real estate, part in this city, and part beyond it, enclosed in the following letter: 'St. Louis, July 6th, 1876. Messrs. Eugene Kelly & Co., New York: Gentlemen: We enclose deeds for property in this city and at Cheltenham, to secure the payment of the drafts we drew yesterday. We send this as promised, and feel certain that it and what you already have on hand will cover your advances. Respectfully yours, Henry J. Spaunhorst, President.' "

Those deeds went forward. I will not say, definitely, just what the entire overdrafts amounted to—it was between thirty and forty thousand dollars. The deeds of trust were received and accepted, and the property afterwards sold, leaving a large deficit. And Kelly & Co. held possession of the South Carolina bonds and the Kansas Pacific and the St. Louis, Kansas City and Northern Railway stocks. They first proved up their claim in respect to this matter as unsecured, and finding afterwards that the real estate did not cover their indebtedness, and there was a large balance due them, they asked to withdraw that as an unsecured claim, and to be allowed to prove it as a secured claim—alleging the security to be a banker's lien upon the bonds and stocks for the amount due them, after exhausting their other securities.

I have omitted a material circumstance which ought to be stated—one transaction at this end of the line, and one at the other —namely: When the officers of this bank were called upon, on the 5th day of July, to face this large deficit—to face bankruptcy or do something to prevent it—they began to canvass as to their condition, and their reliance was upon Kelly & Co. They ascertained how much they had overdrawn. They made a calculation as to what their general credit ought to be, and they made an estimate as to the value of the bonds and stocks in the hands of Kelly & Co., and estimated it at about $25,000. Now, when the telegram of the Central Savings Bank reached New York, asking to overdraw for $50,000, the officers of that bank canvassed the credit and situation of the Central Savings Bank, and they took out these securities, and made, in the language of the president of the bank, Mr. Kelly, a rough estimate—not going into particular details—of the value of the stocks and bonds belonging to the Central Savings Bank in their hands, and they estimated it roughly at $20,000. After having made this estimate they sent the dispatch which I read before: "No; you cannot draw for $50,000, but you may draw for $20,000, including the $9,000 or $10,000 that you already owe us."

These are undisputed facts. Since this is a contest between the assignee in bankruptcy of the Central Savings Bank, representing the general creditors of the bankrupt bank, and Kelly & Co., who claim a special lien upon the proceeds of these bonds and stocks, and since this is a question which turns entirely upon the fact as to whether Kelly & Co. have a lien upon these bonds and stocks for the general balance due them, it is only necessary to determine whether, under the circumstances of this case, Kelly & Co. have what is known in the law as a banker's lien on the South Carolina bonds and on the railroad stocks in their hands at the time of the failure.

Whether a banker has a lien for any general balance due him, depends upon the circumstances of the particular case. The law will not force a lien on a banker, any more than upon any one else, against the actual or presumed intention of the parties. If there is a lien, it is because there is, at all events, nothing in the transaction which repels the presumption of giving credit on the strength of the securities. Therefore, in the case to which Mr. Conroy called attention—a leading case on this subject—that of Lucas v. Dorrien, 7 Taunt. 278, a party went to a banker and said: "I want to raise on the security of a lease a certain sum of money." The bankers considered the proposition, and rejected it. But the lease, in the language of the report, was "casually left" in the possession of the bankers, and the bankruptcy of the owners of the lease having afterwards happened, the bankers claimed they were entitled to hold this lease by virtue of a banker's lien upon it. But the court said, "No"— and very properly. "This was left here by mistake—left here casually. The party brought it here to get a specific loan upon it. You refused it, and he neglected to take it away. You cannot hold that lease as a pledge—you cannot make that available as a basis of any lien in the nature of a banker's lien."

The supreme court of the United States, which, so far as this court is concerned, must be considered to be the source of the highest authority on this subject, has had this question before them in three cases—quite famous cases—which have been referred to by the counsel: Bank of Metropolis v. New England Bank, 1 How. [42 U. S.] 234; which

went before the court again in 6 How. [47 U. S.] 213, and an illustrative case of Wilson v. Smith. 3 How. [44 U. S.] 763. The bank cases were very strong ones,. and, perhaps, carry the doctrine of banker's liens as far as it has ever been carried. In substance. the case was this: Two banks were, as here, correspondents of each other. Each bank was in the habit of transmitting paper for collection to the other. In this particular case certain paper was transmitted by its correspondent, endorsed to it, and apparently belonging to the sender, to a bank to collect. The bank did collect it, and the bank which had transmitted it proved to be insolvent and owing the bank which made the collection. The bank insisted on holding the proceeds of this collection, although, in fact, the paper collected belonged to a third bank. The real owner of the paper that had been collected by the bank brought suit against it to recover the proceeds. The supreme court of the United States held that, inasmuch as these two banks were the correspondents of each other, and inasmuch as this paper did not show on its face that it belonged to any other than the correspondent bank, the defendant bank which collected it had all the right that it would have if it had really belonged to the correspondent, and. therefore, it had a right—and they recognized the right —to hold the proceeds of that collection to secure any balance due to it, in the absence of knowledge or notice of facts to put it on inquiry that it belonged to the other bank. It is a very strong application of the doctrine of a banker's lien.

I think Mr. Conroy is entirely mistaken in arguing, under the circumstances, that, in the case at bar, there were any facts which tended to show that Kelly & Co. did not rely upon these securities. Presumptively they would rely on them, but we are not remitted or relegated to any presumption in this case, because, as I said before, it is in evidence— it is in undisputed evidence—that both parties so understood it; for when it was proposed on the part of the Central Savings Bank to make this large overdraft. they made an estimate of the value of the securities in the hands of Kelly & Co. On the other hand, Kelly & Co., before they would allow even an overdraft of $20,000, made an estimate of the value of these securities, showing that they relied on them. It is not a case where these securities had been pledged for some specific collateral purpose. Not at all. Kelly & Co. acted in the utmost good faith—something which, on this record, however it may be in fact. cannot. I think, be entirely predicated of the action of the Central Savings Bank; for here they drew without any express authority—overdrew. They sent a letter, "We will remit or forward securities to cover our overdraft." advising them that they had overdrawn $24.000. What would a banker understand by that? He wouldn't understand by "securities" that they were forwarding

them deeds to real estate to cover advances in money.

Then, again, the understanding of the parties as to the nature of the possession of these securities appears in this letter of July 6th: "We send these deeds as promised, and feel certain that it, with what you already have on hand. will cover your advances." They had nothing on hand but a large overdraft on themselves. except these bonds and stocks. True, this letter was not acted upon, because, before it reached Kelly & Co. and any drafts had been paid on the strength thereof, Kelly & Co. became aware of the failure of the bank here; still it is evidence of an understanding on the part of the bank officers here that these bonds and stocks were there as a basis of credit.

Now. on this record, I have not a particle of doubt, on the acknowledged law, the settled law in relation to the right of the banker to a lien on papers and securities in his hands, where there is no agreement that negatives it, and where such a lien is consistent with the whole transaction, that Kelly & Co. have a lien on these stocks and bonds in their possession as against the general creditors of the Central Savings Bank. That having been the judgment below, it is affirmed. Affirmed.

[NOTE. For an action of the assignee to recover an illegal preference of the Central Savings Bank. see Phelan v. Iron Mountain Bank, Case No. 11.069.]